UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
TYRONE HOUSTON, a/k/a TYRONE BLACK,     :
                        Plaintiff,      :
                                        :
            -v-                         :      09 Civ. 801 (DLC)
                                        :
MARTIN HORN, individually and as        :      OPINION & ORDER
commissioner of New York City           :
Department of Correction, et al.,       :
                        Defendants.     :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiff:

Tyrone Houston, pro se
# 141-09-13726
Manhattan Detention Center
125 White Street
New York, NY 10013

For defendants:

Lesley Ann Berson
New York City Law Department
100 Church Street
New York, NY 10007


DENISE COTE, District Judge:

     Tyrone Houston ("Houston"), proceeding pro se, brings this

action pursuant to 28 U.S.C. § 1983 against Martin Horn

("Horn"), individually and in his capacity as Commissioner of

New York City Department of Corrections ("DOC"), certain DOC

corrections officers, medical staff, and employees, and the City

of New York (the "City") (collectively, the "defendants").

Houston alleges that, while he was incarcerated on Rikers Island, defendants violated his constitutional rights by retaliating against him for filing grievances, failing to attend to his medical needs, and using excessive force against him. Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  For the following reasons, the motion is granted.

BACKGROUND

The following facts are undisputed except where indicated. Houston was held in DOC custody as a pretrial detainee at Rikers Island and the Manhattan Detention Center ("MDC") from January 29, 2006 until September 9, 2008.  During his approximately 31 months' incarceration, Houston was transferred to different housing areas at Rikers Island and the MDC approximately thirty times.

1.   2006

When Houston was initially admitted to the custody of DOC in January 2006, he was assigned to a "General Population" housing[1] area at the Anna M. Kross Center ("AMKC"), one of a

---

[1] "General Population" housing is for inmates who have undergone an initial risk screening and have been determined not to require any type of special housing.  See Department of Corrections Directive No. 4020R-A, § III(M)(1) (2007) ("DOC Directive 4020R-A").

number of facilities on Rikers Island.[2]  Upon admission, Houston
was designated as "Heat Sensitive," which required him to be
placed in air-conditioned housing.  DOC staff also determined
that Houston suffered from two chronic medical conditions --
hypertension and glaucoma -- for which he received regular
treatment during his incarceration.  Between January 29 and
April 7, 2006, Houston was re-housed within AMKC three times due
to his designation for "Administrative Escort" housing.[3]

     While housed at AMKC, Houston contends that he filed two
grievances dated March 6 and March 30, 2006, pursuant to DOC's
Inmate Grievance Resolution Program ("IGRP").[4]  In the

_____

[2] Upon arrival at Rikers Island, an inmate undergoes an initial
risk screening.  Based on this evaluation, an inmate is assigned
a classification score which designates the inmate as belonging
to one of five custody levels:  Low, Low-Medium, High-Medium,
High, or Incomplete.  An inmate is assigned housing based on his
or her classification score.  Inmates assigned to general
population are reclassified every sixty days, and all inmates
are reclassified each time they are transferred to another
facility.  Inmates may also be reclassified at any time based on
a variety of factors, such as disciplinary infractions, age, or
court orders.  Over the course of his incarceration, Houston's
classification score placed him in the High-Medium and sometimes
Low-Medium categories.

[3] "Administrative Escort" housing is for inmates who require
closer observation due to disruptive or troublesome behavior,
and therefore require that they be escorted when leaving their
housing area.  See DOC Directive 4020R-A, § III(Q).  Houston was
placed in Administrative Escort housing on February 11, 2006 and
moved back into General Population housing on March 22.

[4] Inmates in DOC custody may file complaints about aspects of
their incarceration with the Grievance Office located at each
correctional facility.  Each Grievance Office is staffed with a
civilian Grievance Coordinator and a uniformed Grievance

grievances, Houston complained that defendants Deputy Warden Edwin Bennett ("Bennett") and Security Captain Michael Williams ("Williams") were unresponsive to his concerns about "rodents and water buds [sic]" in his cell.[5]

On April 7, 2006, Houston was transferred to the George Motchan Detention Center ("GMDC") due to reclassification. Houston was housed at GMDC until July 18, during which time he was re-housed five times and allegedly subjected to numerous cell and body searches.[6]  Houston contends that he filed a grievance dated June 19, 2006, in which he complained that between April 17 and June 19, he was re-housed four times in retaliation for complaints sent to the deputy warden.[7]

On May 2, while housed at GMDC, medical staff detected that Houston had a hernia and referred Houston for surgery.  Houston refused to go to a surgery appointment on May 25 and again on

---

Officer.  All inmate grievances are addressed pursuant to the IGRP, as set forth in Department of Corrections Directive No. 3375R-A (2008) ("DOC Directive 3375R-A").

[5] Copies of the March 6 and March 30, 2006 grievances were attached to the amended complaint.  DOC has no record that Houston filed these grievances.

[6] Defendants have introduced evidence that four of the five housing transfers within GMDC were due to reclassification; the fifth was for security reasons.

[7] A copy of the June 19, 2006 grievance was attached to the amended complaint.  DOC has no record that Houston filed this grievance.

June 5, at which time he requested that he not be placed on any surgery list.

On July 18, 2006, New York City experienced a severe electricity "blackout" which left Rikers Island operating on back-up generators.  Houston was transferred from GMDC to another facility on Rikers Island to maintain him in air-conditioned housing.  As the blackout continued to affect Rikers Island, on July 20, Houston was transferred to the air-conditioned MDC in Manhattan.  Houston was housed at the MDC until November 29, during which time he was re-housed within the MDC three times.[8]  Houston alleges that he was subjected to additional retaliatory body and cell searches while housed at the MDC.

On November 29, Houston was transferred back to GMDC, where he was held until January 22, 2007.  During this period, Houston was re-housed within GMDC once, on December 13, 2006, for security reasons.  Houston alleges that he was subjected to numerous cell and body searches during this time.

---

[8] The defendants claim that the three housing transfers within MDC were pursuant to a DOC practice of periodically re-housing inmates who are incarcerated for long periods of time as a security measure.  According to Jose Torres, a Captain in DOC's Office of the Chief of Custody Management and Environmental Health, periodically moving inmates among different housing areas and facilities is an effective way to minimize or eliminate certain disruptive and quasi-criminal activities among inmates.

2.   2007

On January 3, 2007, while still housed at GMDC, Houston went to a surgery appointment at Bellevue hospital for his hernia, which resulted in a scheduling of his surgery for February 2007.  On January 22, Houston was transferred from GMDC to the Robert N. Davoren Complex ("RNDC") for security reasons. Houston remained at RNDC until May 7, 2008, during which time he was re-housed within RNDC six times and allegedly subjected to more cell and body searches.[9]  On February 13, Houston refused to go to Bellevue hospital for his scheduled hernia surgery.  Over the following six months, Houston was seen by medical staff without complaint of abdominal pain until August 2007.

On March 12, 2007, Houston sent a letter to defendant Gregory McLaughlin, RNDC Warden ("McLaughlin"), which was forwarded to the RNDC Grievance Office.  The letter raised a number of complaints, including that DOC staff were "moving [Houston] from housing unit to housing unit, in retaliation for [his] lawsuits and exercise of [his] right to petition."

---

[9] Defendants have presented evidence that some of these transfers were due to changes in Houston's classification, while others were pursuant to DOC's practice of periodically re-housing inmates who are in custody for long periods of time.  In addition, defendants assert that some transfers were the result of changes in RNDC's Departmental Classification Housing Plan, which was a facility-wide initiative that affected all inmates housed at RNDC.

Houston filed six additional grievances while housed at RNDC.  First, on March 14, Houston filed a grievance in which he alleged that, during the course of a housing transfer, defendants Corrections Officers Vasquez, Ortiz, and Singletary "grabbed [him] and pulled [his] lower back out and denied [him] medical attention."  Because Houston's March 14 grievance concerned an alleged assault, the Grievance Coordinator informed Houston that it was "non-grievable" under the IGRP.[10]  On March 19, the Grievance Coordinator sent a memorandum to Warden McLaughlin to inform him of the alleged assault.

On March 27, Houston filed a second grievance concerning the alleged assault, which was also rejected by the Grievance Coordinator as "non-grievable" and forwarded to Warden McLaughlin.  An "Investigating Supervisor's Report," prepared after an investigation ordered by Warden McLaughlin, concluded that no force had been used against Houston during the March 14

---

[10] DOC designates certain categories of inmate complaints as "non-grievable," meaning that they are not addressed through the IGRP process.  See DOC Directive 3375R-A, § II(C)(1)-(2).  These categories include:  (1) issues or programs that already have their own administrative or investigative process; (2) allegations of assault or harassment by staff or inmates; and (3) requests to remove, censure, or discipline a staff member.  Id.  Issues with their own administrative or investigative process include classification designations, use of force allegations, and any matter under investigation by the DOC Investigation Division or New York City Department of Investigation.  See id. at § II(C)(3).  If an issue is non-grievable, the Grievance Coordinator must inform the inmate of the proper administrative mechanism to resolve the issue, if any.

incident.  At his deposition, Houston testified that after the
March 14 incident, he experienced pain in his lower back and
tenderness in his right side, signed up for "sick call," went to
the clinic the next day, and was prescribed ibuprofen.[11]  Houston
again sought and obtained medical treatment on March 27, and was
prescribed ibuprofen.

On August 16, 2007, Houston told RNDC medical staff that
his hernia was bothering him.  Houston was referred for surgery,
and a surgery appointment was scheduled for November 2007;
another appointment was subsequently scheduled for February
2008.  Houston missed both appointments.  Between August 2007
and August 2008, Houston was seen two to four times per month by
medical staff, during which time there is no record of Houston
complaining of abdominal pain.

---

[11] By letter dated January 23, 2010, Houston moved to suppress
his deposition testimony on the grounds that defendants' counsel
"altered and tampered" with the deposition transcript.  Houston
submitted errata sheets in which he objected to approximately 80
percent of the transcript, and offered new testimony in
substitution for the testimony to which he objected.  Assuming
Houston's objection was timely under Fed. R. Civ. P. 32(d)(4),
Houston's allegation of tampering is belied by the fact that the
deposition transcript was prepared and signed by a certified
court reporter.  Further, while Fed. R. Civ. P. 30(e)(1)(B)
permits a deponent to make changes to the substance of his or
her testimony, the deponent is required to "list[] the changes
and the reasons for making them."  (Emphasis added.)  Houston
did not comply with this requirement.  In any event, Houston has
not objected to the portions of his deposition upon which this
Opinion relies.

Houston alleges that on September 7 and 8, 2007, he was denied medical treatment for arthritis and lower back pain.  On September 7, 8, and 9, 2007, Houston filed three grievances concerning conduct by medical staff at RNDC.  Because medical staff members are not DOC employees, the Grievance Coordinator informed Houston that these complaints were non-grievable.[12]

3.   <u>2008 and Placement in Close Custody</u>

On January 15, 2008, Houston filed a sixth grievance at RNDC requesting an accounting of expenditures from his account.  This grievance was informally resolved to Houston's satisfaction on January 17 when he was provided with a receipt of the transaction history on his account.

On May 7, 2008, Houston was transferred from RNDC to AMKC for security reasons, where he remained in the same housing area until July 4.  While housed at AMKC, Houston filed a grievance on June 11, complaining that he did not receive his special diet meal, and another grievance on June 12, complaining that there were insufficient materials in the law library.  Because Houston indicated that he filed previously these grievances with the Board of Correction and/or a state or federal court, the

---

[12] The September 9 grievance was resolved by restoring Houston's telephone service as requested in his grievance form.

Grievance Coordinator informed Houston that they were non-grievable.

Houston alleges that at a June 23, 2008 "Inmate Counselor Meeting," defendant Bennett threatened retaliation against him for filing grievances and complaints against AMKC staff. The same day, Houston sent a letter to defendant Horn about Bennett's threat and requested an investigation. There is no evidence that Houston ever received a response.

On July 3, Houston was designated for involuntary "Close Custody/Protective Custody" housing based on purported information received by AMKC staff that his life was in danger.[13] Houston was provided a written DOC form prepared by defendant Williams and approved by defendant Bennett that notified him of this placement. The form states that "[Houston] admitted that he was involved in a stabbing of [four] Latin Kings while he was incarcerated in Elmira State Correctional facility in 2003. Based on the incident the [Latin Kings] placed a hit on [Houston]." The form indicated that Houston was being confined to Close Custody "for his safety and the security of the facility" and notified him of his right to a due process hearing to challenge his placement. On July 4, Houston was transferred to RNDC and housed in Close Custody for five days until July 9,

---

[13] "Close Custody/Protective Custody" housing is for inmates who require enhanced monitoring for their personal protection. See DOC Directive 4020R-A, at § III(N)(2).

when he was transferred back into General Population housing at RNDC.

On July 14, Houston was re-housed within RNDC as a security precaution.  Houston filed a grievance dated July 14 concerning the RNDC medical staff's purported failure to place him in non-Heat-Sensitive housing.[14]  On July 16, Houston sent a letter to defendant Horn complaining about, inter alia, the purported retaliatory housing transfers, his placement in Close Custody confinement, and the failure to place him in Heat-Sensitive housing.

On July 30, Houston filed another grievance complaining that the RNDC medical staff had failed to treat an injury to his toe in a timely manner.  Houston's medical records show that on the date in question, he arrived at the clinic at approximately 7:30 p.m. and was seen by a clinician around midnight.  Houston was treated with ibuprofen and instructed to return to the clinic for persisting symptoms.  The Grievance Coordinator informed Houston that, because he sought to have the medical staff members who treated him investigated or disciplined, the issue was non-grievable under the IGRP.

---

[14] Although defendants claim that DOC has no record of the July 14, 2008 grievance, the copy of the grievance that is attached to the amended complaint appears to have been stamped by the RNDC Grievance Coordinator.  Further, a subsequent grievance dated August 8, 2008 -- which was included as a defense exhibit -- has a handwritten notation which states that the July 14, 2008 grievance was "returned to [Houston] as non-grievable."

Between August 4 and August 7, 2008, Houston was re-housed approximately four times within RNDC due to problems with the air-conditioning in different housing units.  On August 8, Houston filed a grievance concerning this series of housing transfers, alleging that he had been moved out of air-conditioned housing in retaliation for his previous grievances. Houston requested a copy of each grievance that he had filed with a written decision.  On August 18, the Grievance Coordinator informed Houston that his retaliation claims could not be verified and that he had been properly housed in Heat Sensitive housing.  The Coordinator agreed to provide Houston with copies of the grievances filed at RNDC, most of which had been returned to him as non-grievable.  On August 21, Houston signed the form to indicate that he accepted this informal resolution of his grievance.

On August 20, Houston was scheduled for a yet another surgery appointment for his hernia at Bellevue hospital, but again refused to go.  On September 9, Houston was discharged from DOC custody.

4.  <u>This Litigation</u>

Houston filed the original complaint in this action on January 28, 2009, and an amended complaint on August 24.  In the amended complaint, Houston asserts claims against all defendants

for retaliation, deliberate indifference to his medical needs, and excessive use of force in violation of his constitutional rights pursuant to 28 U.S.C. § 1983.  On February 17, 2010, after the close of fact discovery, defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56, and served Houston with a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment" pursuant to Local Rule 56.1.  On March 2, Houston filed his opposition to defendants' motion.  In his opposition, Houston argues, inter alia, that defendants' motion for summary judgment and supporting affidavits are "frivolous," and requests that the Court sanction defendants' counsel pursuant to Fed. R. Civ. P. 11(c).  The motion for summary judgment became fully submitted on March 19.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986); Roe v. City of Waterbury, 542 F.3d 31,
35-36 (2d Cir. 2008).  When the moving party has asserted facts
showing that the non-movant's claims cannot be sustained, the
opposing party must "set forth specific facts showing that there
is a genuine issue for trial," and cannot rest on the "mere
allegations or denials" contained in the pleadings.  Fed. R.
Civ. P. 56(e); Wright v. Goord, 554 F.3d 255, 266 (2d Cir.
2009).  That is, the nonmoving party "must do more than simply
show that there is some metaphysical doubt as to the material
facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986).  Only disputes over material facts --
facts that might affect the outcome of the suit under the
governing law -- will properly preclude the entry of summary
judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986); SCR Joint Venture, 559 F.3d at 137.  "It is well
established that the submissions of a pro se litigant must be
construed liberally and interpreted to raise the strongest
arguments that they suggest."  Triestman v. Fed. Bur. of
Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation
omitted).  The rule favoring liberal construction of pro se
submissions is especially applicable to civil rights claims. See
Weixel v. Bd. of Ed. of the City of New York, 287 F.3d 138, 146
(2d Cir. 2002).

1.   <u>Exhaustion of Administrative Remedies</u>

Houston alleges that while he was in DOC custody, he was subjected to numerous housing transfers, body and cell searches, and held in Close Custody in retaliation for filing grievances in violation of his First Amendment rights.  The Prison Litigation Reform Act of 1995 ("PLRA"), 110 Stat. 1321-71, as amended, 42 U.S.C. § 1997e <u>et seq.</u>, requires a prisoner to exhaust all available administrative remedies before he can bring a civil rights action pursuant to 28 U.S.C. § 1983.  <u>See</u> 42 U.S.C. § 1997e(a)[15]; <u>Woodford v. Ngo</u>, 548 U.S. 81, 93 (2006); <u>Hernandez v. Coffey</u>, 582 F.3d 303, 305 (2d Cir. 2009). "[F]ailure to exhaust is an affirmative defense under the PLRA." <u>Johnson v. Rowley</u>, 569 F.3d 40, 45 (2d Cir. 2009) (citing <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007)).

"Exhaustion is 'mandatory' and 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.'" <u>Hernandez</u>, 582 F.3d at 305 (quoting <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002)).  "[R]etaliation claims fit within the category of inmate suits about prison life, and therefore must be preceded by the exhaustion of state

---

[15] The PLRA's exhaustion requirement states:  "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

administrative remedies available." <u>Ziemba v. Wezner</u>, 366 F.3d 161, 163 (2d Cir. 2004) (citation omitted).  "Section 1997e(a) requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits).'" <u>Hernandez</u>, 582 F.3d at 305 (quoting <u>Woodford</u>, 548 U.S. at 90).  Where the prison's procedures permit appeal of an adverse ruling, to exhaust the available procedures a prisoner must file an appeal.  In other words, an inmate must use "all steps that the agency holds out." <u>Woodford</u>, 548 U.S. at 90 (citation omitted).

DOC's IGRP consists of five levels of review for inmate grievances.  <u>See</u> DOC Directive 3375R-A, § IV(B).  After an inmate has submitted his grievance form, the Inmate Grievance Resolution Committee ("IGRC") has five business days in which to resolve the issue informally.  If the IGRC is unable to reach a resolution, or if the grievant does not consent to the resolution proposed by the IGRC, then the inmate may request a formal hearing in front of the IGRC to present his complaint and call supporting witnesses.  The inmate may also request a formal hearing if he does not receive any response from the IGRC within five business days.  The IGRC must then issue a written decision addressing the validity of the inmate's grievance.  If the inmate is unsatisfied with the IGRC's decision, he may appeal the decision to the commanding officer of the facility, then to

the Central Office Review Committee ("CORC"), and finally to the New York City Board of Correction ("BOC").  An inmate's administrative remedies are not exhausted until he proceeds through all five levels of the IGRP.

Houston failed to exhaust his administrative remedies for his retaliation claim insofar as it relates to the housing transfers and body and cell searches.  Housing transfers and body and cell searches are conditions of confinement subject to resolution through the IGRP.  The IGRP also specifically permits inmates to submit grievances concerning any retaliation for filing complaints.  See DOC Directive 2275R-A, § IV(C)(1) ("An inmate may file a grievance that a reprisal occurred through the grievance program.").

Houston filed no grievance concerning the purported retaliatory body and cell searches.  He filed at most three grievances concerning housing transfers: (1) the June 19, 2006 grievance concerning four housing transfers within GMDC between April 17 and June 19, 2006; (2) the March 12, 2007 letter to Warden McLaughlin; and (3) the August 8, 2008 grievance concerning four housing transfers within RNDC between August 4 and August 7, 2008.  DOC has no record of the June 19, 2006 grievance and the March 12, 2007 letter was not properly filed as a grievance.  Even if Houston properly filed these grievances, however, he did not pursue either grievance through

all five levels of the IGRP.  For instance, having heard no
response from the IGRC within five working days, Houston was
required to request a formal hearing.  Because Houston has
offered no evidence that he requested a formal hearing or that a
formal hearing was ever held, Houston did not properly exhaust
his administrative remedies with respect to these two
grievances.

With respect to the August 8, 2008 grievance, Houston
accepted the Grievance Coordinator's informal resolution of this
grievance on August 21.  If Houston was dissatisfied with the
informal resolution of this grievance, as he now claims he was,
he could have requested a formal hearing before the IGRC and
pursued his remaining administrative remedies under the IGRP.
Houston did not.  Accordingly, to the extent Houston's § 1983
claim is based on purported retaliatory housing transfers or
body and cell searches, his claim is dismissed for failure to
exhaust administrative remedies.

Houston argues that his failure to exhaust administrative
remedies should be excused.  Prior to the Supreme Court's
decision in Woodford, 548 U.S. 81, the Second Circuit explained
that failure to exhaust administrative remedies may be excused
when:

> (1) administrative remedies are not available to the
> prisoner; (2) defendants have either waived the
> defense of failure to exhaust or acted in such as way

as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004).  Since Hemphill, it has become clear that "'the PLRA exhaustion requirement requires proper exhaustion.'"  Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford, 548 U.S. at 93) (emphasis added).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  Woodford, 548 U.S. at 90-91.  Whether the Hemphill exceptions survive Woodford's holding requiring "proper exhaustion" remains unclear.  See, e.g., Macias v. Zenk, 495 F.3d 37, 43 n.1 (2d Cir. 2007) (declining to "decide what effect Woodford has on Hemphill's holding"); Ruggiero v. County of Orange, 467 F.3d 170, 175-76 (2d Cir. 2006) (same).

Even assuming the Hemphill exceptions survive Woodford, Houston has failed to show that any exception applies in this case.  First, Houston contends that the purported retaliatory housing transfers constitute "staff harassment," and are therefore non-grievable under the IGRP.  Contrary to Houston's contention, housing transfers can be grieved under IGRP policy, even if the transfers are alleged to be reprisals for filing

grievances.  In fact, Houston's August 8, 2008 grievance, which concerned four purported retaliatory housing transfers, was informally resolved through the IGRP process to Houston's satisfaction.

Second, Houston alleges that it is an "unwritten policy and custom" of defendants to prevent court access by not permitting full exhaustion of administrative remedies, or by claiming that some issues are "non-grievable" when in fact they are.  Houston further alleges that defendants "tampered with prison records, medical records and omitted grievances that were filed in order to prevent court access."  Houston has not pointed to any grievance concerning housing transfers or body and cell searches, however, that was returned to him as non-grievable, or for which he was unable to exhaust his administrative remedies due to any interference by defendants.  It has been assumed for purposes of this Opinion that Houston properly filed each of the grievances that he describes in his opposition to this motion. As a result, Houston's failure to exhaust administrative remedies with respect to the purported retaliatory housing transfers or body and cell searches cannot be excused.

Summary judgment is therefore granted to defendants on Houston's retaliation claim based on the purported retaliatory housing transfers and body and cell searches.  Because administrative remedies are no longer available, the claim shall

be dismissed with prejudice.  <u>Giano v. Goord</u>, 380 F.3d 670, 675
(2d Cir. 2004) ("[D]ismissal with prejudice, when remedies are
no longer available, is required in the absence of any
justification for not pursuing such remedies." (citation
omitted)).

Construing Houston's submissions liberally, <u>Triestman</u>, 470
F.3d at 474, Houston's § 1983 claim is also premised on his
allegation that he was placed in Close Custody on July 3, 2008
in retaliation for filing grievances against AMKC staff.  Unlike
housing transfers and body and cell searches, designations for
Close Custody housing are not grievable under the IGRP.  <u>See</u> DOC
Directive 3375R-A, § II(C)(1) (stating that classification
designations, such as "Close Custody Housing" are non-grievable
under the IGRP).[16]  In any event, defendants do not argue that
Houston failed to exhaust any administrative remedies that may
have been available to him with respect to his placement in
Close Custody.  Because failure to exhaust is an affirmative
defense that must be raised by defendants, <u>Johnson</u>, 569 F.3d at

---

[16] Presumably, an inmate's designation for Close Custody
confinement is non-grievable because an inmate may challenge the
designation in a due process hearing, and may appeal any adverse
decision by the hearing officer.  The parties have presented no
evidence, however, as to whether a due process hearing was held
concerning Houston's designation for Close Custody or whether
Houston appealed the result of such a hearing.  <u>Cf.</u> <u>Davis v.</u>
<u>Barrett</u>, 576 F.3d 129, 132 (2d Cir. 2009) (finding exhaustion
where issue was "non-grievable" under New York State's Inmate
Grievance Program and inmate appealed the ruling entered in an
administrative hearing).

45, Houston's retaliation claim based on his placement in Close Custody cannot be dismissed for failure to exhaust administrative remedies.

2.   Retaliation

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Espinal, 558 F.3d at 129 (citation omitted).  The First Amendment protects prisoners from retaliation for filing grievances.  See Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003); Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  Davis v. Goord, 320 F.3d at 353 (citing Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)).  "Otherwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection."  Davis v. Goord, 320 F.3d at 353.  "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be

22

required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." Id. at 352. "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has held that transfers to other facilities or housing units can, under certain circumstances, satisfy the adverse action requirement. See Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998) (transfer from one state prison facility to another constituted an adverse action); see also Gill, 389 F.3d at 384 (three weeks in "keeplock" sufficient to state claim for retaliation); Morales v. Mackalm, 278 F.3d 126, 131-32 (2d Cir. 2002) (transfer to psychiatric facility sufficient to state claim for retaliation), abrogated on other grounds by Porter, 534 U.S. 516.

In this case, Houston has not met his burden of showing that his placement in Close Custody for five days "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Houston has failed to introduce any evidence concerning the conditions of confinement in Close Custody or how these conditions differed from general population housing. For instance, Houston has not shown that he was denied any privileges while in Close Custody

that were previously afforded to him, or that he was subjected to harsher treatment.  Houston has thus failed to meet his evidentiary burden of showing that his placement in Close Custody was anything other than de minimis.  Accordingly, summary judgment is granted to defendants on the retaliation claim.


3.   Deliberate Indifference

    "[A] claim for indifference to the medical needs of . . . a pretrial detainee in state custody, [is] properly brought under the Due Process Clause of the Fourteenth Amendment."  Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009).  "[T]he standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment."  Id. at 70 (citing Arroyo v. Schaefer, 548 F.2d 47, 49-50 & n.3 (2d Cir. 1977)).  Although the "Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994)).  Rather, "a prison official violates the Eighth Amendment only when two requirements are met."  Salahuddin, 467 F.3d at 279 (citation omitted).

The first requirement is objective: the alleged deprivation
of adequate medical care must be "'sufficiently serious.'"  Id.
(quoting Farmer, 511 U.S. at 834).  "Only deprivations denying
the minimal civilized measure of life's necessities are
sufficiently grave to form the basis of an Eighth Amendment
violation."  Salahuddin, 467 F.3d at 279 (citation omitted).
Determining whether a deprivation is "sufficiently serious"
requires two inquiries.  First, a court must determine "whether
the prisoner was actually deprived of adequate medical care."
Id.  "As the Supreme Court has noted, the prison official's duty
is only to provide reasonable care."  Id. (citing Farmer, 511
U.S. at 844-47).  A "mere disagreement over the proper treatment
does not create a constitutional claim.  So long as the
treatment given is adequate, the fact that a prisoner might
prefer a different treatment does not give rise to an Eighth
Amendment violation."  Chance v. Armstrong, 143 F.3d 698, 703
(2d Cir. 1998).

Second, a court must determine "whether the inadequacy in
medical care is sufficiently serious."  Salahuddin, 467 F.3d at
280.  "This inquiry requires the court to examine how the
offending conduct is inadequate and what harm, if any, the
inadequacy has caused or will likely cause the prisoner." Id.  A
number of factors may be relevant to the seriousness of a
medical condition, including: (1) whether "a reasonable doctor

25

or patient would find it important and worthy of comment;" (2) whether the condition "significantly affects an individual's daily activities;" and (3) whether it causes "chronic and substantial pain." Id. (citation omitted). Thus, an alleged deprivation is sufficiently serious where "a condition of urgency, one that may produce death, degeneration, or extreme pain" exists. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

The second requirement for an Eighth Amendment violation is subjective: the prison official must act with a "sufficiently culpable state of mind." Salahuddin, 467 F.3d at 280; see also Caiozzo, 581 F.3d at 71. "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." Salahuddin, 467 F.3d at 280 (citation omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. This means that the prison official "must be subjectively aware that his conduct creates such a risk." Id. at 281 (citation omitted).

Houston has failed to demonstrate that any of the defendants violated his constitutional right to receive adequate medical care. Houston claims that defendants were deliberately indifferent to his medical needs by: (1) denying him pre-operative therapy and an operation for his hernia for over two

years; (2) failing to provide timely medical care after the March 14, 2007 incident; (3) failing to treat his arthritis and lower back pains in September 2007 and July 2008; and (4) failing to adequately treat his injured toe in July 2008.

With respect to the treatment provided for his hernia, Houston has failed to show that he was "actually deprived of adequate medical care." Id. at 279. The evidence shows that Houston's hernia was timely diagnosed on May 2, 2006, and properly treated thereafter. Houston refused, on several occasions, to undergo the surgery required to repair the hernia. When Houston complained of abdominal pain on August 16, 2007, Houston was again scheduled for several surgery appointments, which he missed. Houston has failed to provide any evidence indicating that the treatment for his hernia was inadequate, offering only conclusory allegation that he was not provided "pre-operative therapy necessary to render the operation a success." This is insufficient to withstand summary judgment. See Wright, 554 F.3d at 266.

Houston's claim that defendants were deliberately indifferent to his medical needs following the March 14, 2007 incident is also without merit. Houston's allegation regarding this incident is a delay-in-treatment claim. He asserts that defendants prevented him from obtaining medical care for his alleged injuries until March 27. This assertion is belied by

27

Houston's own testimony that he went to the clinic the day after the incident and received treatment.  It is also undisputed that on March 27, Houston returned to the medical clinic, complaining of the same symptoms, and was again prescribed ibuprofen.  Thus, Houston has failed to show that any of the defendants prevented him from getting adequate treatment for injuries sustained during the March 14, 2007 incident.

Houston has also failed to support his claim of deliberate indifference based on the treatment he received for his injured toe, or the alleged lack of care for his arthritis and back pain.  With respect to his toe injury, Houston complains that he had to wait several hours before being examined by a clinician. Based on Houston's own deposition testimony, however, the delay of which Houston complains is attributable to his refusal to see any of the clinicians working on the earlier shift.  Moreover, the alleged deprivation does not give rise to a constitutional violation because any inadequacy in the medical treatment for his injured toe was not "sufficiently serious."

Likewise, although Houston's medical records do not indicate that he ever complained of arthritis or back pain in July 2007 or September 2008, even if he did, Houston has presented no evidence showing that these medical issues were sufficiently serious.  "The question of whether persistent back pain rises to a level of constitutional significance depends

upon the circumstances of the particular case presented."
Williams v. Smith, No. 02 Civ. 4558 (DLC), 2009 WL 2431948, at
*8 (S.D.N.Y. Aug. 10, 2009) (citing cases).  In this case,
Houston has failed to provide any evidence that his back pain or
arthritis were of such severity as to constitute a serious
medical condition.

Moreover, Houston has failed to show that any of the
defendants acted, or failed to act, with a sufficiently culpable
state of mind.  Houston has introduced no evidence to raise a
question of whether any defendant acted or failed to act while
actually aware of a substantial risk that Houston would suffer
serious harm.  While Houston alleges that certain corrections
officers prevented him from seeking treatment after the March
14, 2007 incident, this allegation is belied by Houston's own
testimony that he was able to seek treatment at the medical
clinic the next day.  Further, Houston points to no evidence to
suggest that any defendant was reckless with respect to the
treatment of Houston's hernia, or any of his other medical
issues.  To the contrary, the record shows that Houston received
reasonable and appropriate medical treatment during his
incarceration at Rikers Island.  Summary judgment is therefore
granted to defendants on the deliberate indifference claim.

4.   <u>Excessive Force</u>

The standard for excessive use of force claims is the same
for pretrial detainees under the Fourteenth Amendment as for
convicted prisoners under the Eighth Amendment.   <u>United States</u>
<u>v. Walsh</u>, 194 F.3d 37, 48 (2d Cir. 1999).   "A claim of cruel and
unusual punishment in violation of the Eighth Amendment has two
components -- one subjective, focusing on the defendant's motive
for his conduct, and the other objective, focusing on the
conduct's effect."   <u>Wright</u>, 554 F.3d at 268.

"The subjective component of the claim requires a showing
that the defendant had the necessary level of culpability, shown
by actions characterized by 'wantonness' in light of the
particular circumstances surrounding the challenged conduct."
<u>Id.</u> (citation omitted).   In the prison context, the issue of
"wantonness" turns on "whether force was applied in a good-faith
effort to maintain or restore discipline, or maliciously and
sadistically to cause harm."   <u>Id.</u> (citation omitted).

The objective component focuses on the harm done, in light
of "contemporary standards of decency."   <u>Id.</u> (citation omitted).
In assessing this component, the court must determine whether
"the alleged wrongdoing was objectively 'harmful enough' to
establish a constitutional violation."   <u>Id.</u> (citation omitted).
"[T]he Eighth Amendment's prohibition against cruel and unusual
punishment does not extend to 'de minimis' uses of physical

30

force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 269 (citation omitted). Thus, the Second Circuit has repeatedly said that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Id. (citation omitted).

Houston alleges that defendants violated his Eighth Amendment rights when certain corrections officers "grabbed him" and "pulled [his] lower back out" during the March 14, 2007 housing transfer. Houston's evidence is insufficient with respect to both the objective and subjective components of the Eighth Amendment claim. First of all, Houston has not shown that the corrections officers even used any force against Houston. Being grabbed, as Houston describes, is a de minimis use of force in the prison context, and certainly not a use of force that is "repugnant to the conscience of mankind." Id. at 269. Moreover, Houston has introduced no evidence to show that the alleged force used against him was employed "maliciously and sadistically to cause harm." Id. at 268. Instead, the corrections officers "grabbed" Houston when he refused to move from one side of a housing area to another. Summary judgment is therefore granted to defendants on the use of force claim.

5.   <u>Municipal Liability</u>

Houston also asserts a § 1983 claim against the City, alleging that the City failed to intervene to stop the individual defendants from violating his constitutional rights. "Section 1983 'imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights.'" <u>Okin v. Village of Cornwall-on-Hudson Police Dep't</u>, 577 F.3d 415, 439 (2d Cir. 2009) (quoting <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978)).  "To prevail against a municipality on a § 1983 claim, a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." <u>Hartline v. Gallo</u>, 546 F.3d 95, 103 (2d Cir. 2008) (citation omitted). Because Houston has failed to demonstrate any underlying constitutional violation, his <u>Monell</u> claim fails. <u>See, e.g.</u>, <u>Segal v. City of New York</u>, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under Monell was entirely correct.").

## CONCLUSION

Defendants' February 17, 2010 motion for summary judgment is granted. Houston's claims are dismissed with prejudice and his request for sanctions is denied. The Clerk of Court shall close the case.

SO ORDERED:

Dated:     New York, New York
           May 13, 2010

                              _____
                                   DENISE COTE
                              United States District Judge